**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| GENTEX CORPORATION and INDIGO TECHNOLOGIES, LLC, | Case No.: 6:21-cv-00755-ADA |
| Plaintiffs, | **JURY TRIAL DEMANDED** |
| THALES VISIONIX, INC., | |
| Involuntary Plaintiff, | |
| v. | |
| META PLATFORMS, INC. and META PLATFORMS TECHNOLOGIES, LLC, | |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO META'S MOTION TO TRANSFER VENUE**
**UNDER 28 U.S.C. § 1404(A)**

# TABLE OF CONTENTS

I.    BACKGROUND...................................................................................................2

II.    ARGUMENT........................................................................................................5

    A.    The Private Interest Factors Favor Keeping the Case in WDTX.................5

        1.    Witness Cost and Convenience Favors WDTX..............................5

        2.    Relative Ease of Access to Sources of Proof Is Neutral. ...............10

        3.    Availability of Compulsory Process Favors WDTX. ....................11

        4.    "Practical Problems" Make Transfer Unfair, Heavily Favoring WDTX. ..........................................................................12

    B.    The Public Interest Factors Favor Keeping This Case in WDTX. ............14

        1.    Administrative Difficulties Flowing from Court Congestion Favor WDTX. ...............................................................................14

        2.    Local Interest in Having Localized Interests Decided at Home Is Neutral. ......................................................................15

        3.    Familiarity with the Law and Avoidance of Conflict of Laws Are Neutral. ........................................................................15

III.    CONCLUSION..................................................................................................15

## **TABLE OF AUTHORITIES**

### **CASES**

*Action Indus., Inc. v. U.S. Fid. & Guar. Co.*,
358 F.3d 337 (5th Cir. 2004) ....................................................................5

*Alacritech Inc. v. CenturyLink, Inc.*,
2017 WL 4155236 (E.D. Tex. Sept. 19, 2017)..........................................5

*BillJCo, LLC v. Apple Inc.*,
2022 WL 607890 (W.D. Tex. Mar. 1, 2022) ......................................11, 15

*Def. Distributed v. Bruck*,
30 F.4th 414 (5th Cir. 2022) ...................................................................11

*Fintiv, Inc. v. Apple Inc.*,
2019 WL 4743678 (W.D. Tex. Sept. 13, 2019)........................................11

*FTC v. Multinet Mktg., LLC*,
959 F. Supp. 394 (N.D. Tex. 1997) ..........................................................13

*Healthpoint, Ltd. v. Derma Scis., Inc.*,
939 F. Supp. 2d 680 (W.D. Tex. 2013)......................................................10

*Hoffman v. Blaski*,
363 U.S. 335 (1960)....................................................................................5

*In re Apple*,
979 F.3d 1332 (Fed. Cir. 2020)..........................................................14, 15

*In re Genentech, Inc.*,
566 F.3d 1338 (Fed. Cir. 2009)...........................................................5, 14

*In re Volkswagen of Am., Inc. (Volkswagen II)*,
545 F.3d 304 (5th Cir. 2008) ......................................................5, 12, 15

*In re Wyeth*,
406 F. App'x 475 (Fed. Cir. 2010) ...........................................................12

*Intellectual Ventures I LLC v. Hewlett Packard Enter. Co.*,
2022 WL 1491096 (W.D. Tex. May 11, 2022) .........................................10

*Konami Digit. Ent. Co. v. Harmonix Music Sys., Inc.*,
2009 WL 781134 (E.D. Tex. Mar 23, 2009) ......................................13, 14

*Kuster v. W. Digital Techs., Inc.*,
2021 WL 466147 (W.D. Tex. Feb. 9, 2021)..........................................................................12

*Martin v. BNSF Ry. Co.*,
2007 WL 4333341 (E.D. Tex. Dec. 10, 2007).......................................................................14

*Monterey Rsch., LLC v. Broadcom Corp.*,
2022 WL 526240 (W.D. Tex. Feb. 21, 2022).................................................................10, 14

*Peteet v. Dow Chem. Co.*,
868 F.2d 1428 (5th Cir. 1989) .............................................................................................12

*Stewart Org. v. Ricoh Corp.*,
487 U.S. 22 (1988)...........................................................................................................5, 14

*TPQ Dev., LLC v. LinkedIn Corp.*,
2013 WL 12247813 (E.D. Tex. Mar. 28, 2013) ...................................................................13

*Voxer, Inc. v. Facebook, Inc.*,
2020 WL 3416012 (W.D. Tex. June 22, 2020) ..................................................................9, 12

Plaintiffs Gentex Corporation and Indigo Technologies, LLC ("Gentex") filed this patent infringement suit against Meta in July 2021.  For seven months, Meta actively litigated the case in this District:  it answered the complaint, negotiated case management issues, served contentions, requested extensions, and filed three discovery motions.  Only in February 2022 did Meta file its motion to transfer venue to the Northern District of California ("NDCA").

There are two explanations for Meta's litigate-and-wait approach.  Either it took Meta seven months to gin up justifications for transfer—despite the fact that its arguments are based primarily on its own witnesses and documents.  This, of course, belies any notion that NDCA is clearly more convenient than the Western District of Texas ("WDTX").  Or, if Meta did not delay for substantive reasons, its delay was strategic:  wait as long as possible before filing, knowing that this Court would delay the *Markman* hearing if a venue transfer motion were still pending at the time of the originally scheduled hearing.  Yet that gamesmanship would sink the motion on fairness grounds.  In either case, Meta's delay is reason enough to deny its Motion.

Whatever the reason, Meta's foot-dragging is understandable:  this case has close ties to Texas and plainly does not warrant transfer.  Although the Court would never know it from reading Meta's motion, Dallas was a technological hub for Oculus, the company that created the foundational predecessors to the accused products.  Dallas was the home base for Chief Technology Officer (and current Meta consultant) John Carmack, along with other engineers who worked on predecessors that formed the technological backbone to the accused products and who continue to work on these products to this day.  Carmack, and others in Texas residing within 100 miles of the Waco courthouse, participated directly in negotiations leading to then-Facebook's acquisition of Oculus, a transaction that forms a substantial basis for Gentex's allegations of willful infringement in this matter.  And still today, Texas is home to two Meta offices, including one of

the company's largest, in Austin, where teams work directly on the accused products.  Rather than wrestle with these inconvenient facts, Meta simply ignores them.

All told, the parties have identified seven Texas-based witnesses in their Rule 26 disclosures, including a third-party witness who, upon information and belief, would not be within the subpoena power in NDCA but is here.  This includes Meta's own identification of Texas-based software engineer Jonathan Wright—disproving Meta's own statement to the Court that "none of the evidence relevant to this suit is located in . . . Texas."  Defs.' Mot. to Transfer, ECF No. 39 ("Br.") at 1.  Meta's attempt to portray NDCA as clearly more convenient rests on an overemphasis on sources of evidence that are marginally relevant at best (like prior art authors) while failing to acknowledge the strong base Oculus has in Texas.  When it comes to actual evidence and witnesses likely to play a real role in the case, NDCA is not clearly more convenient than WDTX.

## I.       BACKGROUND

**Asserted Patents.**  This case concerns five patents for virtual reality ("VR") related inventions, U.S. Patent Nos. 6,757,068; 7,301,648; 8,224,024; 6,922,632; 7,725,253.  To operate effectively, VR systems must be able to keep track of things like a user's head, hands, and handheld controllers.  To do so, such devices incorporate sensor measurement data to estimate the position and orientation of body parts or objects along six dimensions, or "degrees of freedom."  At the time of the inventions, most existing tracking systems relied on external equipment placed in the room, which formed a significant obstacle to both usability and commercial viability.  The Asserted Patents cover innovations that made it possible to forgo the external equipment, minimize equipment worn by the user, and provide a more reliable and flexible user experience.

The '068 and '648 patents describe combining body-mounted "sourceless" orientation trackers, such as inertial sensors, with position trackers to track users' limbs relative to their heads and reflect those limb positions on a display—all without requiring signals propagated from an

external source the user installed in the environment.  The '024 patent teaches how to combine information from an inertial sensor, one camera, and two tracking points to calculate information about the object's orientation, enabling smaller tracking surfaces and more reliable, smoother tracking.  And the '632 and '253 patents describe an innovative "architecture" that structures a tracking system so that one segment collects data from sensors, while another segment updates the estimates used for tracking.  These segments' independence allows sensors to be designed and implemented or changed without knowledge or re-programming of the updating process, and vice versa, enabling more flexible synthesis of data from different sensors.

**Oculus Products.**  The accused products in this case trace their origins to a company named Oculus VR, Inc., which developed VR devices.  Complaint, ECF No. 1 ("Complaint") at ¶ 43 & n.17.  In 2014, Meta's predecessor, Facebook, acquired Oculus VR, Inc., which is now Defendant Meta Technologies LLC.  *See* ECF No. 50.  Oculus VR rolled out its first Oculus-branded consumer VR device, the Oculus Rift, in 2016.  Unlike the accused products, the Oculus Rift used external sensors placed around the room to track the users' location.  Complaint, ¶ 44 & n.19.  Three years later, Oculus released its next generation devices: the Oculus Quest and Oculus Rift S.  Ex. 27 to Borrasso Decl. (hereinafter "Ex.").  Their biggest differentiator—"perhaps the most important element"—was sourceless, "inside-out" tracking.  Ex. 1.

**Oculus's Texas Ties.**  The development of Oculus's headsets, including the pivotal features, is directly tied to Texas, and the connections to Texas persist to this day.  In 2013, the year before it was acquired by Meta, *see* Ex. 10 at 336, 350-51, Oculus scored a coup when it hired the "legendary" John Carmack as its new Chief Technology Officer, Ex. 2.  Carmack was—and is—based in Texas, and worked from a new Dallas Oculus office that the company set up at his insistence when he joined.  Exs. 3, 4.  Carmack was "the technology leader for Oculus," Ex. 4, and

reportedly worked personally on issues relevant here, like head tracking, "inside-out positional tracking," and making Oculus more "mobile," among other things, Exs. 5, 6, 7; Ex. 34 at 139:12-13.  Carmack and his team's work in Dallas served as "the foundation that [Meta] built all the mobile things off of," like the Oculus Quest.  Borrasso Decl. ¶ 10; Exs. 4, 27.

Carmack built a Texas-based team of over a dozen employees.  Ex. 4.  This included Jonathan Wright, who joined the Dallas office in February 2014 and "implemented 6DoF [six-degree of freedom] tracking service for [a] prototype VR platform," Ex. 8, and Matt Hooper, Director of Development for Oculus VR, who touts that he was "involved in some of the most advanced technology pushes," including "into the new worlds of virtual and augmented realities," Ex. 9.  Although Oculus was founded in southern California, Texas was home to a key technological hub (including the Chief Technology Officer)—a fact Meta simply ignores.

Facebook's 2014 acquisition of Oculus also cannot be separated from Texas.  Carmack was essential in pitching Oculus directly to Facebook CEO Mark Zuckerberg, setting the vision for the future of virtual reality and delivering key technological information.  Ex. 10 at 344-46.  He signed off on the deal only after his then-wife, Katherine Kang—also Texas-based—negotiated on his behalf.  *Id.* at 348-49; *accord* Ex. 34 at 108:6-7, 173:16-18, 175:22-24, 176:7-10.

After Facebook acquired Oculus, it retained a strong VR and AR ("augmented reality") presence in Texas, which exists to this day.  Meta maintains offices in both Austin and Dallas, where at least ████████████████████████████████████████████ Decl. of Nicholas Wong, ECF No. 39-1 ("Wong Decl."), ¶ 10; *see* Ex. 35 at Ex. J.  Meta is hiring for 28 Oculus-related jobs in its Austin office.  Ex. 26.  Employees discussed above continue to work on VR products for Meta out of Texas, including Wright, now the Technology Lead Manager for the ████████████████████████████ Ex. 35 at 12, and Hooper, who has remained in his role as

4

Director of Development, Ex. 9.  For his part, Carmack served as Oculus's CTO under Facebook's ownership until November 2019—through the launch of at least two accused products—and continues to consult for Meta while, upon information and belief, residing in Dallas.  Ex. 11.

## II.   ARGUMENT

A party seeking transfer carries the burden of showing good cause, namely that the "transfer is '[f]or the convenience of parties and witnesses, in the interest of justice.'"  *In re Volkswagen of Am., Inc.* (*Volkswagen II*), 545 F.3d 304, 315 (5th Cir. 2008) (quoting 28 U.S.C. § 1404(a)).  Meta must show that the alternative venue is "clearly more convenient."  *Id.*  The Court has wide discretion to decide motions for transfer via "individualized, case-by-case consideration."  *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988).  In assessing each case, "convenience" is key—but so is "fairness."  *Id.*

Since Gentex does not dispute that the destination venue would have been a proper venue, "[t]he determination of 'convenience' turns on a number of public and private interest factors, none of which can be said to be of dispositive weight."  *Action Indus., Inc. v. U.S. Fid. & Guar. Co.*, 358 F.3d 337, 340 (5th Cir. 2004).  Courts evaluate these factors based on the situation which existed at the time of filing.  *Hoffman v. Blaski*, 363 U.S. 335, 342-43 (1960).  Here, the factors plainly favor keeping the case in WDTX.

### A.  The Private Interest Factors Favor Keeping the Case in WDTX.

#### 1.   Witness Cost and Convenience Favors WDTX.

The most important factor in the transfer analysis is witness convenience.  *See In re Genentech, Inc.*, 566 F.3d 1338, 1342 (Fed. Cir. 2009).  When analyzing this factor, the Court considers "all potential material and relevant witnesses."  *Alacritech Inc. v. CenturyLink, Inc.*, 2017 WL 4155236, at *5 (E.D. Tex. Sept. 19, 2017).  Here, more identified witnesses in this case (excluding prior art witnesses of minimal relevance, *infra* Section II.A.3) are in or around WDTX

than are in or around NDCA, and thus this factor favors retention of the case in WDTX.

a.      **A Number of Relevant Witnesses in This Case Are in Texas.**

Given Oculus and Meta's deep and enduring roots in Texas, it is no surprise that many individuals who were involved in the development of the accused products, including inside out-tracking, were and are located in Texas.  Key early Oculus employees John Carmack and Jonathan Wright reside in Texas, as does Matt Hooper, who joined Carmack shortly after the acquisition. *See supra* p. 4.  Although Meta contends that the relevant tracking functionality in the current products was developed and is maintained outside of Texas, Br. 3, Carmack's public work on tracking provided the foundation for later products, Ex. 17 at 18; Borrasso Decl. ¶ 10, and the various contributions are relevant to the baseline for comparing the accused technology and thus to damages.  April 13, 2022 Order, ECF No. 59 at 11.  On information and belief, Carmack and Hooper reside within 100 miles of the Waco courthouse, Ex. 3; Ex. 13, Wright is slightly farther away, within 120 miles, Ex. 12, and Wright and Hooper continue to work for Meta at a Dallas office within 100 miles of the courthouse, Ex. 8; Ex. 9; Ex. 32.

Others in Texas also work on relevant aspects of the accused products, including, for example, Cass Everitt, a long-time software engineer who developed VR "system software and public facing APIs for Quest," Ex. 14; Andrew Welch, who designed a "[h]and [t]racking [t]ech [d]emo for Oculus Quest," Ex. 15; and Jonathan Atkins, Head of Design for Oculus VR and Metaverse, Ex. 16.  Everitt and Atkins work out of Meta's Austin office, Ex. 14; Ex. 16, and upon information and belief also live within 100 miles of the Waco courthouse, Ex. 29; Ex. 30.  Welch works in the Dallas office and, upon information and belief, lives within 105 miles of the courthouse, Ex. 31, and works within 100 miles of the courthouse, Exs. 15, 32.

Texas-based witnesses like Carmack and Kang also are expected to provide factual development and testimony regarding Facebook's acquisition of Oculus VR, Inc., which is directly

relevant to both willfulness and damages.  As the Complaint alleges, due diligence for this transaction involved an extensive intellectual property review, Complaint, ¶¶ 53-55; Ex. 36 at 18:14-18, 67:23-68:23, 71:1-23, 89:21-90:7, which should have included the Asserted Patents given the prominence of the patents and their inventor.  In addition, the negotiations, technological analyses, and valuation information generated during the acquisition will be central to damages.

### b.     Meta's Focus on NDCA Ignores the Full Scope of the Case.

Rather than grapple with inconvenient facts, Meta dismisses them as irrelevant or ignores them altogether.  Meta did not acknowledge that Oculus's Chief Technology Officer (Carmack) lives and works in Dallas.  Meta portrayed legacy Oculus solely as a California company, with no mention of its Texas presence.  Meta ignored the acquisition and predecessor products.  And Meta glossed over all of the work it currently does on Oculus in Texas as irrelevant.  It justified this approach by focusing solely on current employees working on marketing, financials, and what it called the "Accused Features":  "headset and handheld controller tracking algorithms and functionality for determining location using cameras that are allegedly found in [the accused products]."  Br. 3.  Meta's venue declarant, accordingly, limited his investigation to a similar definition of "the accused features."  Ex. 37 at 35:24-36:11, 150:15-18, 151:23-152:6.

But the case—and thus the venue inquiry—is not so narrowly cabined.  For one thing, the "Accused Features" as Meta describes them plainly do not cover the entire scope of the asserted claims.  Br. 3; Wong Decl. ¶¶ 5-6, 11.  For example, certain asserted claims of the '068 patent require "mounting a display device on the user's head," "displaying a first object . . . on the display device," or "displaying a graphical user interface for a computer on the display device."  Ex. 38 at 15:43-45, 16:7-9.  But Meta's venue declarant did not attempt to identify any Meta employees responsible for head-mounted displays in the accused products, Ex. 37 at 82:9-21, and he did not know who was  responsible for VR graphical user interfaces, *id.* at 95:16-96:5.

Nor does Meta's approach encompass any predecessor products, which are particularly relevant here.  As the Court has already acknowledged, "individuals [formerly] at Oculus have relevant knowledge of the state of the art used as the baseline for comparing the accused technology, be it in valuation or as prior art."  ECF No. 59 at 11.  Meta's declarant, who "was just concerned with the accused products," did not investigate the algorithms used in Oculus systems "that preceded the accused products."  Ex. 37 at 142:22-143:6.

Meta's own self-serving identification of witnesses in connection with its motion further undercuts its arbitrary definition of "Accused Features."  Meta's declaration lists California-based teams that are responsible for "the electrical and hardware engineering" for Oculus headsets and handheld controllers, Wong Decl. ¶ 9, and for "integrating cameras into" the accused products, *id.* at ¶ 12.  Meta makes no effort to explain how these hardware engineers relate to its definition of the Accused Features, much less how their testimony could bear on any of the claims at issue.  *See* Br. 3, 7.  Meta appears to have included them in support of this motion (and in its Initial Disclosures) solely to boost the number of California-based witnesses.

When push came to shove, even Meta could not stand behind its statement that "none" of the relevant witnesses are located in Texas.  Br. 1, 10.  In Meta's recent Rule 26 disclosures, it named Texas-based Jonathan Wright as likely to have relevant information Meta may use "related to the structure, function and operation of Meta's accused products, including Oculus software." Ex. 39 at 3.  In its transfer filings, by contrast, Meta had dismissed the relevance of Wright's work on the basis that Wright's team did not design or develop "the tracking algorithms" or "camera systems" used in Oculus products.  Wong Decl. ¶ 10.

All told, the parties' Rule 26 disclosures indicate that this factor favors retaining the case here.  First, Gentex identified third party Kang, Ex. 28 at 5, who, on information and belief, resides

in Texas within 100 miles of this Court, Ex. 19.  Second, Gentex disclosed eight witnesses who are currently employed by or consult for Meta.  *See* Ex. 28 at 2-5.  On information and belief, six of those witnesses live in Texas—four within 100 miles of the Waco courthouse, and the others within 120 miles.  *See supra* Section II.A.1.  The other two Meta employees included on Gentex's Rule 26 disclosures live in or around Zurich, Switzerland or Seattle, Washington.  Ex. 28 at 4-5.  Third, Gentex disclosed two of its own witnesses.  *Id.*  One lives in Pennsylvania; the other is Eric Foxlin, an inventor and former employee.  *Id.*  Foxlin now lives in California and works for another company, but he has signed a declaration that he is willing to travel to WDTX for trial and that such travel would not pose an undue burden for him, Ex. 24, so his involvement does not support transfer, *see Voxer, Inc. v. Facebook, Inc.*, 2020 WL 3416012, at *4 (W.D. Tex. June 22, 2020).

Meta identified one additional former Gentex employee as a potential witness, an inventor on one patent who lives in Massachusetts.  Ex. 39 at 4.  Meta also identified ten potential Meta witnesses.  One is Mr. Wong, whose knowledge is "related to the location of witnesses and evidence," *id.* at 3; because he is a relevant witness for venue, but not trial, his location should not be considered as part of this factor.  As to the others, Meta identified Wright in Dallas, two witnesses located in Washington (Everist and Melim), one located in Zurich, Switzerland (Oth), and six located in California (Southard, Hazegh, Camposeco, Chen, Leung, and Linde).  *Id.* at 3; Ex. 35; *see also infra* Section I.A.3 (addressing Meta's prior art witnesses).  Two of those California witnesses, Southard and Hazegh, lead hardware engineering teams unlikely to bear on these claims, and should not weigh heavily, if at all.  *See supra* p. 8.

Thus, considered as a group, a trial in NDCA is not clearly more convenient than WDTX.  Even taking Meta's disclosure at face value, Meta has identified six non-venue party witnesses located in California, while Gentex has identified six party witnesses and one third party located

in or around WDTX (one of whom Meta also identifies).  Both parties have identified one inventor located in NDCA, but he is willing to travel for trial.  Ex. 24.  The other witnesses live outside either district—in Switzerland, Israel, Washington State, Pennsylvania, and Massachusetts—and their collective travel will not be more inconvenient to WDTX than to NDCA.  *See Intellectual Ventures I LLC v. Hewlett Packard Enter. Co.*, 2022 WL 1491096, at *7-8 (W.D. Tex. May 11, 2022).  For example, flights from Seattle to San Francisco are over two hours, Ex. 18, making a day trip infeasible for trial.  Trips from overseas pose similar inconvenience in both districts. Therefore, this factor favors retaining the case in WDTX.  *See Monterey Rsch., LLC v. Broadcom Corp.,* 2022 WL 526240, at *12 (W.D. Tex. Feb. 21, 2022) (factor weighed against transfer when "witnesses for the majority of the products would find trial in the WDTX to be more convenient").

### 2.    Relative Ease of Access to Sources of Proof Is Neutral.

Although the sources of proof in this litigation are scattered across the globe, a plurality of relevant party witnesses are, and were at the time of the relevant work, located in Texas, so Gentex expects a sizeable portion of the proof will come from Texas.  *See Healthpoint, Ltd. v. Derma Scis., Inc.*, 939 F. Supp. 2d 680, 688 (W.D. Tex. 2013).  Meta's assertion that the "majority of the relevant evidence is maintained in or closer to N.D. Cal.," Br. 8, does not address large swaths of evidence and is therefore unreliable.  For one thing, Meta again relies on its self-selected list of "Accused Features," which does not cover all aspects of the asserted claims, let alone all topics relevant to the case.  *See supra* Section II.A.1.b.  For another, Meta ignores that Gentex and involuntary Plaintiff Thales are East Coast companies located closer to this District than NDCA, and Meta has served dozens of discovery requests on Gentex and Thales.  Exs. 41-45.  Even as to the topics and sources Meta does address, it makes no effort to differentiate between documentation maintained in NDCA as compared to other locations it identifies—namely, ███

█████████████████████████████  *see* Br. 7; Wong Decl. ¶ 16.  The only specific

documents it mentions as being located within NDCA are inventor notebooks, from which Gentex already has been producing documents without undue burden.  Br. 7-8; ECF No. 40 ¶¶ 26-27. Finally, Meta asserts that documents will be *collected* by a ███████████████ Wong Decl. ¶ 17, but that says nothing about where those documents were created and maintained.  Indeed, to give weight to a litigation support team's location would invite gamesmanship, as the party could select a location to manufacture evidence for a transfer motion.

The limited evidence Meta proffered does not establish that a "majority" of documentary evidence is in NDCA, leaving the Court to guess at what exists where and failing to carry Meta's burden.  *See, e.g.*, *Def. Distributed v. Bruck*, 30 F.4th 414, 434 (5th Cir. 2022).  Because sources of proof are located in both districts, this factor is neutral.

### 3.    Availability of Compulsory Process Favors WDTX.

A federal court can subpoena a witness to attend trial only if the witness is either "within 100 miles" or "within the state" where the witness "resides, is employed, or regularly transacts business in person."  *BillJCo, LLC v. Apple Inc.*, 2022 WL 607890, at *4 (W.D. Tex. Mar. 1, 2022).  Under this factor, the Court focuses on "non-party witnesses whose attendance may need to be secured by a court order."  *Fintiv, Inc. v. Apple Inc.*, 2019 WL 4743678, at *5 (W.D. Tex. Sept. 13, 2019).  All but one of the central witnesses in the case either work for a party or have agreed to attend trial in WDTX, so compulsory process will not be necessary.  A key witness regarding the Meta's acquisition of Oculus, Katherine Kang, could be compelled to testify only in WDTX, not NDCA, Ex. 33, app. 1, at 4; Ex. 19, so this factor weighs in favor of WDTX.

Meta did not consider Kang's residence in its assessment of this factor, presumably because it assumed—contrary to this Court's subsequent ruling—that Meta's acquisition of Oculus was not relevant.  ECF No. 59 at 10.  In contending that this factor favors NDCA, Meta relies on the inventor, Eric Foxlin, and authors of alleged prior art.  But Mr. Foxlin has now declared he will

voluntarily attend trial, Ex. 24, ¶ 3, so there will be no need for compulsory service and his residence is not relevant under this factor, *see Voxer*, 2020 WL 3416012, at *4.

That leaves alleged prior art witnesses who reside in NDCA as Meta's only support.  Br. 4-5, 9.  However, as the Court knows, these prior art witnesses rightly receive "minimal weight" because they "are very unlikely to testify." *Kuster v. W. Digital Techs., Inc.*, 2021 WL 466147, at *4 (W.D. Tex. Feb. 9, 2021), *mandamus denied sub nom. In re W. Digital Techs., Inc.*, 847 F. App'x 925 (Fed. Cir. May 10, 2021).  Moreover, while prior art witnesses theoretically could be relevant in some circumstances, Meta offers no reason why the prior art developed by individuals located in California is more relevant than any of the other 90-plus prior art references Meta referenced in its contentions, Ex. 40, including prior art tied to Texas.  For instance, Frank Brick was the President of Telxon Corporation, which sold an alleged prior art system—making him both a prior art witness and a potential damages witness, Ex. 25—and he is available in WDTX and not NDCA, Ex. 20.  Because there is no basis to conclude that the alleged prior art witnesses Meta selected here would actually be relied upon at trial, they do not favor transfer.  Allowing such speculation about prior art witnesses to outweigh the existence of third-party witness Kang would only encourage mischief, as the moving party could lard up its contentions with any number of prior art references to influence the transfer decision.  This factor favors WDTX.

### 4. "Practical Problems" Make Transfer Unfair, Heavily Favoring WDTX.

Even were the facts themselves not strongly against transfer, Meta's delay in filing this motion merits denial.  When considering this factor, courts look to "all other practical problems that make trial of a case easy, expeditious and inexpensive." *Volkswagen II,* 545 F.3d at 315. Critically, parties "should not delay filing of a motion to transfer." *In re Wyeth*, 406 F. App'x 475, 477 (Fed. Cir. 2010); *Peteet v. Dow Chem. Co.*, 868 F.2d 1428, 1436 (5th Cir. 1989).  Instead "[p]arties seeking a change of venue should act with 'reasonable promptness.'" *In re Wyeth*, 406 F.

App'x at 477 (denying writ of mandamus when the district court determined that familiarity with case and delay outweighed potential convenience of the destination forum).  Meta's delay in filing its motion weighs heavily against transfer.  There is no justification for that delay:  the witnesses and documents on which it primarily relies are within its control.  And Meta waited months after receiving Gentex's preliminary infringement contentions (served in October 2021) and over six weeks after serving its invalidity contentions (early January, after an extension) before filing.

In the meantime, the parties and the Court have expended significant resources on the case.  Meta has brought three disputes to the Court and Gentex has brought another—all of which the Court has resolved.  Exs. 46-48 (Court's Email Orders); ECF No. 59.  The parties also negotiated scheduling orders, ECF Nos. 27, 37, and a proposed Protective Order, ECF Nos. 51, 56, and Meta has produced a terabyte of source code for inspection.  The parties have served infringement and invalidity contentions and initial disclosures, and have briefed claim construction.  Despite many meet and confers, Meta never mentioned its intent to move for transfer.  Indeed, Meta filed its motion (without conferring) one day after assuring Gentex and the Court that a requested extension would not impact the *Markman* hearing then set for April 25.  Ex. 23; ECF No. 37 at 2.

Many courts have found that a similarly long delay in filing a motion to transfer venue weighs heavily against transfer.  *See, e.g.*, *FTC v. Multinet Mktg., LLC*, 959 F. Supp. 394, 395 (N.D. Tex. 1997) ("nearly seven months" after case filing was not reasonably prompt); *Konami Digital Ent. Co. v. Harmonix Music Sys., Inc.*, 2009 WL 781134, at *7 (E.D. Tex. Mar 23, 2009) (six-month delay weighed against transfer); *TPQ Dev., LLC v. LinkedIn Corp.*, 2013 WL 12247813, at *6 (E.D. Tex. Mar. 28, 2013) (same for a five-month delay).  What was true in those cases is all the more so here.  Meta's delay is particularly prejudicial because it filed at a time when it was likely to, and in fact, did, delay the *Markman* hearing in this case.  Transfer would only

compound this prejudice, because it would likely cause the parties to lose the rescheduled *Markman* date (June 24, 2022) and trial date (May 1, 2023).

That Meta filed its motion before the Court's formal deadline for transfer motions is no excuse. That deadline allows for investigation to unearth reasons for transfer not in the moving party's control; it is not an excuse for "gamesmanship." *Martin v. BNSF Ry. Co.*, 2007 WL 4333341, at *4 (E.D. Tex. Dec. 10, 2007). When Meta "had all the information it needed to file a motion to transfer when it filed its answer," it is clear "the motion to transfer was filed merely for tactical delay and not for the convenience of any witness or party." *Id.* Indeed, courts have no trouble weighing this factor heavily against transfer when, as here, transfer would cause "prejudice of losing both the *Markman* and trial dates currently set." *Konami*, 2009 WL 781134, at *7.

### B. The Public Interest Factors Favor Keeping This Case in WDTX.

#### 1. Administrative Difficulties Flowing from Court Congestion Favor WDTX.

This factor weighs how quickly "a case can come to trial and be resolved." *In re Genentech*, 566 F.3d at 1347; *In re Apple*, 979 F.3d 1332, 1343 (Fed. Cir. 2020). Because courts consider factors on an "individualized, case-by-case" basis, *Stewart Org. v. Ricoh Corp.*, 487 U.S. 22, 29 (1988), courts look to particularized statistics to determine where this specific case—not a generic civil case—"can come to trial and be resolved" sooner, *In re Genentech*, 566 F.3d at 1347. Meta's insistence that this factor is neutral because the times to civil trial in the WDTX and NDCA are "similar," Br. 12, relies on generic statistics for all civil cases, *see* ECF No. 40-32, instead of statistics specific to patent cases—which weigh against transfer, *see, e.g.*, *Monterey Rsch. LLC*, 2022 WL 526240, at *13-14. Patent cases in WDTX, on average, come to trial and are resolved in 25.9 months, Ex. 21, nearly 20 months faster than NDCA's 45.2 months, Ex. 22. The case would be resolved sooner in WDTX, so this factor weighs against transfer. *See Monterey Rsch. LLC*, 2022 WL 526240, at *14.

### 2. Local Interest in Having Localized Interests Decided at Home Is Neutral.

This factor addresses whether there is a local interest in deciding local issues at home, *Volkswagen II*, 545 F.3d at 317, focusing on "the significant connections between a particular venue and the events that gave rise to a suit." *In re Apple*, 979 F.3d at 1345. Here, as described above, significant technological steps that gave rise to this suit happened in Texas. *See supra* Sections I, II.A.1. Oculus's longtime CTO was and still is located in Texas, within 100 miles of the courthouse, as are others who played important roles at Oculus. *See supra* Sections I, II.A.1. And unlike other cases where a defendant's office had nothing to do with the products accused, *cf., e.g.*, *In re Apple*, 979 F.3d at 1345, Meta works on the accused products out of its offices in Austin—one of the company's largest—and Dallas, *supra* Sections I, II.A.1; *see also* Ex. 35 at Ex. J (Texas employees). An infringement finding could have significant impact on the many dozens of Oculus-related jobs in Austin and elsewhere in Texas. This District is far from "untethered to this lawsuit," Br. 13; this factor, therefore, is neutral, *see BillJCo, LLC*, 2022 WL 607890, at *9.

### 3. Familiarity with the Law and Avoidance of Conflict of Laws Are Neutral.

Gentex agrees that these factors are neutral.

## III. CONCLUSION

Meta fails to meet its burden to show that NDCA is clearly more convenient than this District. Four of the relevant factors disfavor transfer, and the others are neutral, as shown below:

|  | Factor | Proposed Finding |
|---|---|---|
| **Private** | Relative ease of access to sources of proof | Neutral |
|  | Availability of compulsory process | Favors WDTX |
|  | Cost of attendance for willing witnesses | Favors WDTX |
|  | All other practical problems | Favors WDTX |
| **Public** | Administrative difficulties from court congestion | Favors WDTX |
|  | Local interest in having localized interests decided at home | Neutral |
|  | Familiarity of forum with governing law | Neutral |
|  | Avoidance of conflict of laws | Neutral |

The Court therefore should deny Meta's motion to transfer.

Dated:  May 20, 2022

Respectfully Submitted,

_/s/ G. Blake Thompson_

**G. Blake Thompson**
State Bar No. 24042033
Blake@TheMannFirm.com
**J. Mark Mann**
State Bar No. 12926150
Mark@TheMannFirm.com
**MANN | TINDEL | THOMPSON**
201 E. Howard Street
Henderson, Texas 75654
Tel: (903) 657-8540
Fax: (903) 657-6003

David I. Berl (_pro hac vice_)
Adam D. Harber (_pro hac vice_)
Elise M. Baumgarten (_pro hac vice_)
Melissa B. Collins (_pro hac vice_)
D. Shayon Ghosh (_pro hac vice_)
Arthur John Argall III (_pro hac vice_)
Andrew G. Borrasso (_pro hac vice_)
WILLIAMS & CONNOLLY LLP
680 Maine Avenue S.W.
Washington, D.C. 20024
Tel: 202-434-5000
Fax: 202-434-5029
dberl@wc.com
aharber@wc.com
ebaumgarten@wc.com
mcollins@wc.com
sghosh@wc.com
aargall@wc.com
aborrasso@wc.com

**ATTORNEYS FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 20, 2022, a true and correct copy of the foregoing was served to the parties' counsel of record via ECF.

                                           */s/ G. Blake Thompson*
                                           **G. Blake Thompson**